IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:14-CV-282-D

| | |
|---|---|
| JOANN HESTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DISH NETWORK, LLC, and | ) |
| CONVERGENT OUTSOURCING, INC., | ) |
| | ) |
| Defendants. | ) |

**ORDER**

On October 30, 2014, JoAnn Hester ("plaintiff" or "Hester") filed a civil complaint against Dish Network, LLC ("Dish Network") and Convergent Outsourcing, Inc. ("Convergent") (collectively, "defendants") in Bladen County Superior Court. See [D.E. 1-1] 7–19. On December 3, 2014, defendants removed the case to this court [D.E. 1]. On November 20, 2015, defendants moved for summary judgment [D.E. 16] and filed a memorandum in support [D.E. 19] together with supporting exhibits [D.E. 19-1 through 19-17]. Thereafter, Hester responded [D.E. 20], and defendants replied [D.E. 21]. On April 12, 2016, Hester moved for a court-hosted settlement conference [D.E. 22], and, on May 3, 2016, defendants responded in opposition [D.E. 23]. As explained below, the court grants defendants' motion for summary judgment and denies Hester's motion for a court-hosted settlement conference.

I.

In early February 2013, Hester "learn[ed] of D[ish Network's] offer to provide an introductory package plus the Encore movie channels for $52.60 per month all told for two years." Compl. [D.E. 1-1] ¶ 7; see Hester Dep. [D.E. 19-8] 18–19. Believing this deal to be a good one,

Hester contacted Mick Niemi ("Niemi") to obtain Dish Network service. Compl ¶ 8; see Hester Dep. 18–20. Niemi worked as a satellite installer for Innovative Satellite Systems ("Innovative"), an authorized Dish Network retailer. Picchione Aff. [D.E. 19-15] ¶ 3; [D.E. 19-17]. On February 11, 2013, Niemi went to Hester's residence to install the necessary equipment. Compl. ¶ 8; see Hester Dep. 18, 20–25;.

Before Dish Network activated service, Hester alleges that she and Niemi orally "agreed to [the] terms" of a subscription to Dish Network that provided an introductory package plus Encore for $52.60 per month for two years "along with auto-pay from her checking account of all amounts rightfully due." Compl. ¶¶ 8–9; see Ans. [D.E. 11] ¶¶ 8–9; Hester Dep. 20, 29–30. Hester states that she did not sign any written contract with Niemi, Innovative, or Dish Network. Compl. ¶ 10; see Hester Dep. 20, 27–28. Dish Network disputes Hester's characterization of events. According to Dish Network, on February 11, 2013, Innovative contacted Dish Network to activate service for the equipment Innovative had installed at Hester's residence. See Picchione Aff. ¶ 4; [D.E. 19-15] 18. Innovative later provided Dish Network with a "Digital Home Advantage Plan" contract, signed by Hester and bearing her name on the signature line. Picchione Aff. ¶ 4; see [D.E. 19-9] (Digital Home Advantage Plan). Although Dish Network cannot be certain that Innovative did so for Hester, "usual business practice" dictated that Innovative "would [have] le[ft] a copy of the Residential Customer Agreement" with any new customer. Picchione Aff. ¶ 4.

Dish Network establishes the terms of its relationship with subscribers in written contracts. Specifically, the Digital Home Advantage Plan and the Residential Customer Agreement both govern a customer's relationship with Dish Network. The Digital Home Advantage Plan is the contract that a new customer signs before Dish Network establishes service. See [D.E. 19-9]. The Residential Customer Agreement, in turn, incorporates and expands upon the Digital Home Advantage Plan.

2

Id. 1 ("The Residential Customer Agreement ('RCA'), incorporated herein, contains additional terms and conditions."); see [D.E. 19-10] (Residential Customer Agreement). In addition to its usual business practice of leaving the Residential Customer Agreement with new customers at the time of establishing service, see Picchione Aff. ¶ 4, Dish Network makes the Residential Customer Agreement available in the "receiver's user guide" and also online. [D.E. 19-9] 1. On February 12, 2013, Dish Network sent Hester a "new customer kit." Picchione Aff. ¶ 5; [D.E. 19-15] 18. The record does not reflect whether the "new customer kit" contained either the Digital Home Advantage Plan or the Residential Customer Agreement, and Hester claims that none of the information she received at the time of establishing service contained a written contract. See Compl. ¶ 10; Hester Dep. 23–24.

Hester also alleges that, at least initially, she did not receive billing statements from Dish Network. Specifically, Hester alleges that, unbeknownst to her, a Dish Network employee "created an email account" with the username "jhester5982@yahoo.com" and that Dish Network emailed all her account statements to that email address. Compl. ¶ 15; see Hester Dep. 32.[1] Hester claims never to have seen these account statements or to have used her account's online function. Compl. ¶ 15; Hester Dep. 32 ("[Y]ou indicated that you did not own or have access to any computer; is that correct?" "That's correct." "And that you do not have any email account?" "That's correct."). Dish Network admits to sending account statements to the email address associated with Hester's account, but denies having created the email address for her. Ans. ¶ 15; Picchione Aff. ¶¶ 6–7. At any rate, someone accessed Hester's account online in February and March 2013, input an email address

---

[1] The record is unclear whether the email address associated with Hester's account was "jhester5982@yahoo.com" or "hesterj5982@yahoo.com." Compare Compl. ¶ 15 and Ans. ¶ 15, with Picchione Aff. ¶ 6 and [D.E. 19-15] 18. The court employs the version of the email address Hester alleges in her filings.

3

purportedly belonging to Hester as the email address for the account, converted the account preferences to allow for online billing, paid the balance using a debit card, and requested that "future monthly payments be debited against the same card." Picchione Aff. ¶¶ 6–7; [D.E. 19-15] 18–19. Although Hester admits to requesting that Dish Network bill her through her debit card, she claims that she made this request to Niemi's wife. Hester Dep. 28–29.

Hester's relationship with Dish Network deteriorated when Dish Network began charging Hester more than $52.60 per month, the amount Hester believed was due under her alleged oral contract. Specifically, in February 2014, Dish Network charged Hester $78.04. See Compl. ¶¶ 20–21; Ans. ¶ 21; [D.E. 19-15] 20. This charge of greater than $52.60 per month put Hester on notice regarding a misunderstanding as to the price charged for the service. Hester Dep. 44–46 ("So in February is when they started taking out [more], so I must have called them in March."). As a result, Hester claims to have begun calling Dish Network in March 2014 about her bill. Compl. ¶ 27; Hester Dep. 46–47. During these conversations, Hester claims that Dish Network told her that she "had no contract with them, so D[ish Network] could take what it wanted." Compl. ¶ 27; see Hester Dep. 46–48, 51. Although Dish Network admits that its agents spoke with Hester in March 2014, it denies having ever told her that she had no contract or that Dish Network could take what it wanted. See Ans. ¶ 27; [D.E. 19-15] 21.

On June 9, 2014, Hester terminated all Dish Network services. Compl. ¶¶ 28–29; Ans. ¶ 28; Picchione Aff. ¶ 8; Hester Dep. 58; [D.E. 19-15] 21. On June 10, 2014, Hester contacted Dish Network to discuss the cancellation process. See Compl. ¶ 30; Ans. ¶ 30; Picchione Aff. ¶ 8. Dish Network informed Hester that, in accordance with the contract she signed, it would charge her $180 to cover her early termination fee and equipment costs. Compl. ¶¶ 30–31; see Ans. ¶ 31; Picchione Aff. ¶ 8; Hester Dep. 58–59; [D.E. 19-15] 21. Additionally, Dish Network notified Hester that Dish

4

Network would charge her credit card $17 if Hester chose to use the return box and prepaid shipping label Dish Network provides for its customers. See Hester Dep. 59 ("[T]hey told me they were going to take [$17] and I put—right here's the— off my credit card. And that was two days prior to us going to court."); see also Picchione Aff. ¶ 8; [D.E. 19-15] 21; Compl. ¶¶ 30–31; Ans. ¶ 31. Hester claims to have protested, stating that she never signed a contract. Compl. ¶ 32; Hester Dep. 52–53. Hester, however, requested a return box and prepaid shipping label to return her equipment. Picchione Aff. ¶ 8 ("Ms. Hester . . . requested that D[ish Network] provide her with a return box and prepaid shipping label so that she could return the leased equipment to D[ish Network]."); [D.E. 19-15] 21; see Hester Dep. 59. Dish Network sent Hester a copy of the contract Dish Network had in its records, in addition to verbally notifying her of cancellation charges and the $17 return-box fee. Compl. ¶¶ 30–32; Ans. ¶ 32; [D.E. 19-15] 21; see Hester Dep. 52–53.

On June 17, 2014, Hester, believing the contract to be fraudulent, called Dish Network to inform Dish Network of the alleged fraud, to "request[ ] a commensurate refund," and to tell Dish Network not to take any further money from her account. Compl. ¶ 44; see Ans. ¶ 44 (admitting that Hester contacted Dish Network about her account); [D.E. 19-15] 21. Hester alleges that Dish Network responded by saying that Hester "was welcome to make a police report," but that Dish Network would "charge any fees it deemed itself due" under the contract. Compl. ¶ 45. Dish Network disputes the content of the conversation, but admits to speaking with Hester that day about her account. Ans. ¶ 45; see [D.E. 19-15] 21.

On June 24, 2014, Hester sued Dish Network in Wake County Small Claims Court, alleging that Dish Network auto-drafted amounts in excess of those permitted under what Hester understood to be the contract. [D.E. 19-2]; see Compl. ¶ 49; Hester Dep. 50. On July 28, 2014, the magistrate hearing Hester's case entered judgment in favor of Dish Network [D.E. 19-3]. Additionally, the

5

magistrate found that Hester had signed the Digital Home Advantage Plan. See Hester Dep. 65. On August 4, 2014, Hester appealed the magistrate's decision to Wake County District Court [D.E. 19-4], and the case was sent to mandatory arbitration. See [D.E. 19-5]; see also [D.E. 19-4] ("Many counties have mandatory arbitration programs in which appeals from small claims court are heard by an arbitrator before they go to a district court trial."). On November 21, 2014, the arbitrator entered judgment in favor of Dish Network [D.E. 19-5]. On December 19, 2014, Hester requested trial de novo in Wake County District Court [D.E. 19-6]. On February 11, 2015, however, Hester filed a notice of voluntary dismissal [D.E. 19-7].

After filing her initial action in Wake County Small Claims Court on June 24, 2014, Hester continued to interact with Dish Network. On either June 25 or August 6, 2014, Hester returned her Dish Network receiver in Dish Network's return box using the prepaid shipping label. Compare Pincchione Aff. ¶ 9, [D.E. 19-15] 22 and Hester Dep. 59, with Compl. ¶ 55. Hester claims to have included a handwritten note in the return box that instructed Dish Network not to charge Hester's credit card for use of the return box and prepaid shipping label. Compl. ¶ 55; Hester Dep. 59; see [D.E. 1-1] 64. After receiving the return box, Dish Network charged a $17 return-box fee to Hester's credit card on file. Picchione Aff. ¶ 10; [D.E. 19-15] 22. On or about July 28, 2014, during cross-examination in Wake County Small Claims Court, Dish Network presented Hester with a "Residential Customer Agreement," which it claimed was the true and accurate contract to which Hester agreed. Compl. ¶¶ 52–53; Ans. ¶ 52; [D.E. 19-12] ¶ 9 (describing "the 28 July 2014 misrepresentation in Wake County Small Claims Court that the unsigned purported form contract obligated Plaintiff to pay money to D[ish Network]").

Additionally, Hester alleges that defendants contacted her in order to collect on her alleged debts. On September 25, 2014, Hester received a phone call requesting that she contact Dish

Network. Compl. ¶¶ 58–59; Ans. ¶ 58; see Pincchione Aff. ¶ 14. Although Hester claims that Dish Network contacted her directly, Dish Network alleges that Afni, a third-party debt collection company, placed this call. Compare Compl. ¶ 58, with Pincchione Aff. ¶ 14. On October 9, 2014, Dish Network sent Hester an account statement notifying Hester that she owed $175.15. Compl. ¶ 61; Ans. ¶ 61; Pincchione Aff. ¶ 11. On October 15, 2014, Convergent sent Hester a letter requesting payment of the balance of her Dish Network account. Compl. ¶ 63; Ans. ¶ 63; Hunter Aff. [D.E. 19-16] ¶ 4. At some point after Convergent sent its letter, Hester's counsel notified Convergent that Hester had hired counsel concerning the Dish Network account. Compl. ¶ 66; Hunter Aff. ¶ 5; see [D.E. 21-1] ("Cease-Communication and Attorney Representation Letter" dated October 29, 2014). Finally, Hester believes that Dish Network may have reported her alleged failure to pay "as a derogatory tradeline on her consumer credit report." Compl. ¶ 67. Dish Network denies having reported Hester's failure to pay. Picchione Aff. ¶ 15.

On October 30, 2014, while litigating her claims against Dish Network in Wake County, Hester filed the present action against Dish Network and Convergent in Bladen County Superior Court. Compl. 1. Hester states explicitly that "[a]ll damages inflicted before 24 June 2014 are covered in a prior case." Compl. ¶ 49. Therefore, Hester alleges that defendants' actions taken after June 24, 2014, violate North Carolina law. First, Hester argues that Dish Network "misrepresented to Plaintiff that she had signed a contract favorable to Dish and then charged $17 to her credit card by false pretenses," in violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1 et seq. Id. ¶ 69. Second, Hester claims that Dish Network "converted $17 of Plaintiff's property" when it charged Hester's credit card for using Dish Network's return box and prepaid shipping label to return her equipment. Id. ¶ 70. Third, Hester alleges that Dish Network violated the North Carolina Debt Collection Act, N.C. Gen. Stat. §§ 75-50 et. seq., when Dish

7

Network directly and indirectly contacted Hester, a represented consumer, and attempted to collect debts not owed. Id. ¶ 71. Finally, Hester alleges that Convergent violated the North Carolina Collection Agency Act, N.C. Gen. Stat. §§ 58-70-1 et seq., when it contacted Hester, a represented consumer. Id. ¶ 72.

## II.

In considering a motion for summary judgment, the court views the evidence in the light most favorable to the non-movant and applies well-established principles under Rule 56 of the Federal Rules of Civil Procedure. See, e.g., Fed. R. Civ. P. 56; Scott v. Harris, 550 U.S. 372, 378 (2007); Celotex Corp. v. Catrett, 477 U.S. 317, 325–26 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–55 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson, 477 U.S. at 247–48.

The party seeking summary judgment must initially demonstrate an absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 325. Once the movant meets its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact for trial. See Matsushita, 475 U.S. at 587. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. Conjectural arguments will not suffice. See id. at 249–52; Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party . . . cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Nor will a "mere . . . scintilla of evidence in support of the [nonmoving party's] position . . . ; there must be evidence on

8

which the [fact finder] could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

Here, the alleged events occurred in North Carolina, and the parties agree that North Carolina law applies. Accordingly, the court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issue. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013). In predicting how the Supreme Court of North Carolina would address a contested issue, the court "may consider lower court opinions[,] . . . treatises, and the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted). In doing so, however, a federal court "should not create or expand [a] [s]tate's public policy." Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (first alteration in original) (quotation omitted); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999). Moreover, in predicting how the Supreme Court of North Carolina would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 397–98.

A.

Initially, the court must address which of Hester's claims it may consider. North Carolina recognizes "the common law rule against claim-splitting" as part of its res judicata jurisprudence. See Bockweg v. Anderson, 333 N.C. 486, 492, 428 S.E.2d 157, 161 (1993). Generally, "all damages incurred as the result of a single wrong must be recovered in one law suit." Id. at 492, 482 S.E.2d at 161 (emphasis in original). However, "[w]here a plaintiff has suffered multiple wrongs at the hands of a defendant, a plaintiff may normally bring successive actions." Id. at 492, 482 S.E.2d at

9

161; see Sanderford v. Duplin Land Dev., No. COA15-1214, 2016 WL 4087476, at *3 (N.C. Ct. App. Aug. 2, 2016).

On June 24, 2014, Hester brought an action in Wake County Small Claims Court alleging many of the wrongs in her present complaint. Compl. ¶ 49; see [D.E. 19-2]. Moreover, Hester states explicitly that her June 24, 2014 lawsuit covers "all damages inflicted" before that date. Compl. ¶ 49. However, according to Hester, defendants' interactions with Hester after June 24, 2014, are "successive wrongs" sustained after Hester filed her Wake County Small Claims Court complaint. Accordingly, the court considers the following actions alleged in Hester's present complaint, occurring after June 24, 2014: (1) Dish Network's charge of $17 for Hester's use of the return box and prepaid shipping label; (2) Dish Network's supplying of the Residential Customer Agreement on July 28, 2014, in Wake County Small Claims Court; (3) Dish Network's alleged attempt to withdraw $175.15 from Hester's checking account in August or September 2014; (4) the September 25, 2014, phone call Hester allegedly received from Dish Network; (5) the October 9, 2014, account statement Dish Network mailed to Hester;[2] (6) Convergent's October 15, 2014, letter regarding Hester's unpaid balance, as it applies to both Dish Network and Convergent; and, (7) any derogatory tradeline Dish Network placed on Hester's consumer credit as a result of this dispute. [D.E. 19-12] ¶ 4; see Compl. ¶¶ 56–72.

B.

First, Hester seeks treble damages, the cost of suit, and attorney's fees under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. §§ 75-1.1 et seq.

---

[2] Dish Network admits to having sent Hester account statements "on August 9, 201[4], September 9, 201[4], and October 10, 201[4]." Picchione Aff. ¶ 11. Hester only mentions the October 2014 account statement in her filings. Compl. ¶¶ 61, 71; [D.E. 19-12] ¶ 9. Accordingly, the court limits its discussion to the October 2014 statement.

10

Specifically, Hester alleges that Dish Network violated the UDTPA when it charged Hester $17 for using Dish Network's return box and prepaid shipping label. See Compl. ¶ 69.[3] The UDTPA creates a cause of action for consumers injured by "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a); see Dalton v. Camp, 353 N.C. 647, 655–56, 548 S.E.2d 704, 710–11 (2001). "A plaintiff bears the burden of proof on a claim of unfair and deceptive practice." Stott v. Nationwide Mut. Ins. Co., 183 N.C. App. 46, 54, 643 S.E.2d 653, 658 (2007).

To state a UDTPA claim under North Carolina law, a plaintiff must plausibly allege that (1) defendant committed an unfair or deceptive act or practice, (2) the act or practice was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff. See N.C. Gen. Stat. §§ 75-1.1, 75-16; Bumpers v. Cmty. Bank of N. Va., 367 N.C. 81, 88, 747 S.E.2d 220, 226 (2013); Walker v. Fleetwood Homes of N.C., Inc., 362 N.C. 63, 71–72, 653 S.E.2d 393, 399 (2007); Dalton, 353 N.C. at 656, 548 S.E.2d at 711; RD & J Props. v. Lauralea-Dilton Enters., LLC, 165 N.C. App. 737, 748, 600 S.E.2d 492, 500 (2004). Under the UDTPA, an unfair act is one which "offends established public policy," or is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Marshall v. Miller, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981); Carcano v. JBSS, LLC, 200 N.C. App. 162, 172, 684 S.E. 2d 41, 50 (2009). A deceptive act "has the capacity or tendency to deceive," though generally "proof of actual deception is not required." Marshall, 302 N.C. at 548, 276 S.E.2d at 403; Dalton, 353 N.C. at 656, 548 S.E.2d at 711.

---

[3] Insofar as Hester alleges that Dish Network's debt-collection actions violate the UDTPA, those claims fail as a matter of law. The North Carolina Debt Collection Act supplants the UDTPA "in the area of commerce regulated" under it. N.C. Gen. Stat. § 75-56(a); see Ross v. Washington Mut. Bank, 566 F. Supp. 2d 468, 479 (E.D.N.C. 2008), aff'd, 625 F.3d 808 (4th Cir. 2010); DirectTV, Inc. v. Cephas, 294 F. Supp. 2d 760, 765 (M.D.N.C. 2003). Apart from charging Hester for use of the return box and prepaid shipping label, the remainder of Hester's allegations against Dish Network concern collection of her purported debts. See Compl. ¶¶ 50–72; [D.E. 19-12] ¶ 9. Accordingly, Hester must bring those claims under the North Carolina Debt Collection Act.

11

"Whether an act or practice is unfair or deceptive under the UDTPA is a question of law for the court." Kelly v. Georgia-Pacific, LLC, 671 F. Supp. 2d 785, 799 (E.D.N.C. 2009) (collecting cases); Solum v. Certainteed Corp., 147 F. Supp. 3d 404, 411 (E.D.N.C. 2015); see Tucker v. Boulevard at Piper Glen LLC, 150 N.C. App. 150, 153, 564 S.E.2d 248, 250 (2002); Eastover Ridge, L.L.C. v. Metric Constructors, Inc., 139 N.C. App. 360, 363, 533 S.E.2d 827, 830 (2000). Moreover, the UDTPA does not encompass merely breaching a contract. See, e.g., Branch Banking & Tr. Co. v. Thompson, 107 N.C. App. 53, 61–62, 418 S.E.2d 694, 700 (1992). Instead, a plaintiff must show "substantial aggravating circumstances attending the breach to recover under the Act." Id. at 62, 418 S.E.2d at 700 (quotation omitted); see Ellis v. La.-Pac. Corp., 699 F.3d 778, 787 (4th Cir. 2012); Bartolomeo v. S.B. Thomas, Inc., 889 F.2d 530, 535 (4th Cir. 1989).

When Hester used the return box and prepaid shipping label, she included a handwritten note that stated "Do not take any money from my account. Send a bill." [D.E. 1-1] 64; see Compl. ¶ 55; Hester Dep. 59–60. Hester claims that Dish Network's charging her $17 for use of the return box and prepaid shipping label notwithstanding this note amounts to an unfair and deceptive trade practice. See Compl. ¶¶ 55–56.

Hester's claim fails as a matter of law. Hester admits that she used the return box and prepaid shipping label knowing that Dish Network would charge her $17 for doing so. Hester Dep. 59; Picchione Aff. ¶ 8; [D.E. 19-15] 21; see Compl. ¶¶ 30–31; Ans. ¶ 31. Even accepting that Hester never signed a Dish Network contract for services, Hester admits that a Dish Network representative notified her of the $17 return-box fee over the phone before she used the return box. Hester Dep. 59 ("[T]hey told me they were going to take [$17] and I put—right here's the— off my credit card."); Picchione Aff. ¶ 8; [D.E. 19-15] 21; see Compl. ¶¶ 30–31. Hester cannot use a service after knowingly accepting the terms governing that service and then sue the service provider for collecting

12

payment based on those terms. Moreover, Hester's inclusion of a note in the return box does not alter this conclusion. Under North Carolina law, Hester accepted the terms that Dish Network communicated to her by using and sending the return box and prepaid shipping label. See Honey Props., Inc. v. City of Gastonia, 252 N.C. 567, 570, 114 S.E.2d 344, 347 (1960) (holding that an offeree may not accept an offer and then attach reservations or conditions after accepting); Cap Care Grp. v. McDonald, 149 N.C. App. 817, 822–23, 561 S.E.2d 578, 581–82 (2002).

Additionally, Dish Network did not violate the UDTPA by charging Hester $17 for use of the return box and prepaid shipping label. As a matter of law, Dish Network's conduct was not "immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers" and did not have the "capacity or tendency to deceive." Marshall, 302 N.C. at 548, 276 S.E.2d at 403. Accordingly, the court grants summary judgment in favor of Dish Network as to Hester's UDTPA claim.

## C.

Second, Hester alleges that Dish Network's $17 charge for her use of the return box and prepaid shipping label amounted to conversion of her property. Compl. ¶ 70. Thus, Hester requests a constructive trust for return of the money, along with "actual and maximum punitive damages." Id.

North Carolina tort law defines conversion of property as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another." Peed v. Burleson's, Inc., 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956) (quotation omitted); Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (quotation omitted). To recover under a conversion theory, a plaintiff must prove both her ownership in the goods or personal chattel and the defendant's wrongful possession or conversion

13

of the goods or personal chattel. Variety Wholesalers, Inc., 365 N.C. at 523, 723 S.E.2d at 747; Gadson v. Toney, 69 N.C. App. 244, 246, 316 S.E.2d 320, 322 (1984). Moreover, in claims involving money, "the general rule is that money may be the subject of an action for conversion only when it is capable of being identified and described." Variety Wholesalers Inc., 365 N.C. at 528, 723 S.E.2d at 750 (quotation and emphasis omitted).

Accepting for the sake of argument that Hester has sufficiently identified the money taken, her claim fails because Dish Network's alleged "conversion" was not wrongful. Even assuming that Hester did not know of the terms in the Digital Home Advantage Plan or Residential Customer Agreement before using the return box and prepaid shipping label, Dish Network explained the $17 charge associated with using its return box and prepaid shipping label to Hester on the phone before she used that service. By requesting and using the return box and prepaid shipping label with full knowledge of the associated costs, Hester accepted the terms governing that transaction, including Dish Network's charging Hester's credit card. See, e.g., Lake Mary Ltd. P'ship v. Johnston, 145 N.C. App. 525, 532, 551 S.E.2d 546, 552 (2001). The court predicts that the Supreme Court of North Carolina would hold that Dish Network did not wrongfully deprived Hester of her $17. Accordingly, the court grants summary judgment in favor of Dish Network as to this claim.

D.

Third, Hester alleges that Dish Network violated the North Carolina Debt Collection Act ("NCDCA"), N.C. Gen. Stat. §§ 75-50 et seq. See Compl. ¶ 71. Specifically, Hester alleges that Dish Network violated the NCDCA when it: (1) possibly took out a "derogatory tradeline" on Hester's consumer credit; (2) presented Hester with the Residential Customer Agreement during cross-examination in Wake County Small Claims Court on July 28, 2014; (3) allegedly attempted to draft $175.15 from Hester's checking account in late August or early September 2014; (4) called

14

Hester attempting to collect money on September 25, 2014; (5) sent Hester an account statement on October 9, 2014; and, (6) allegedly directed Convergent to send Hester a letter regarding the debt she owed to Dish Network on October 15, 2014. See Compl. ¶¶ 51–71.

The NCDCA bars a debt collector from engaging in "the use of threats, coercion, harassment, unreasonable publication of the consumer's debt, deceptive representations to the consumer, or other unconscionable means" in the process of collecting on a debt. Ross, 625 F.3d at 817; Fritz v. Duke Energy Carolinas, LLC, No. 5:13-CV-724-D, 2014 WL 3721373, at *3 (E.D.N.C. July 24, 2014) (unpublished); see N.C. Gen. Stat. §§ 75-51–75-55. Under the NCDCA, the plaintiff bears the burden of establishing three threshold elements: (1) that there was a debt; (2) that the debtor was a consumer; and, (3) that the defendant was a debt collector. Fritz, 2014 WL 3721373, at *3; Reid v. Ayers, 138 N.C. App. 261, 263, 531 S.E.2d 231, 233 (2000); see N.C. Gen. Stat. § 75-50(1)–(3). After establishing the three threshold requirements, the plaintiff then must establish the more generalized requirements of the UDTPA: (1) that there was an unfair or deceptive act; (2) in or affecting commerce; (3) proximately causing an injury to plaintiff. Ross, 625 F.3d at 817; Simmons v. Kross Lieberman & Stone, Inc., 228 N.C. App. 425, 429, 746 S.E.2d 311, 315 (2013); see Reid, 138 N.C. App. at 265–66, 531 S.E.2d at 234–35.

1.

As for Hester's claim that Dish Network possibly took out a derogatory tradeline, Hester has failed to present any evidence that Dish Network reported her deficient account to any company, board, bureau, or other body charged with reporting credit. Compare Compl. ¶ 67 ("On information and belief, since the purported contract authorizes it but Plaintiff has not checked her credit report to make sure, Dish reported . . . a derogatory tradeline on her consumer credit report."); with Ans. ¶ 67 (denying "as alleged" this claim). The only competent evidence shows that Dish Network did

15

not take out a derogatory tradeline. See Picchione Aff. ¶ 15 ("D[ish Network] has not placed any derogatory tradeline on JoAnn Hester's credit report."). Accordingly, the court grants summary judgment in favor of Dish Network as to this claim.

2.

As for Hester's claim that the July 28, 2014, use of the Residential Customer Agreement during cross-examination in the Wake County Small Claims Court case violated the NCDCA, this claim fails. The NCDCA defines a debt collector as "any person engaging, directly or indirectly, in debt collection from a consumer" that is not a licensed debt-collection agency. N.C. Gen. Stat. § 75-50(3). In the Wake County Small Claims Court case, Hester sued Dish Network claiming that Dish Network engaged in fraudulent activity and breached its contract. See [D.E. 19-2]. When Dish Network presented Hester with the Residential Customer Agreement during cross examination, Dish Network was not "engaging, directly or indirectly, in debt collection." See N.C. Gen. Stat. § 75-50(3). Instead, Dish Network was defending itself in an action Hester brought against it. As to this particular claim, Dish Network does not qualify as a debt collector under the NCDCA. Accordingly, the court grants summary judgment in favor of Dish Network as to this claim.

3.

As for Hester's claim that Dish Network attempted to draft $175.15 from her checking account in late August or early September 2014, Hester has failed to provide any evidence of actual injury. The NCDCA creates statutory damages in the form of "civil penalties." N.C. Gen. Stat. § 75-56(b)–(c). A plaintiff, however, must still prove actual injury in order to obtain relief under the NCDCA. Reid, 138 N.C. App. at 266, 531 S.E.2d at 234–35; see Simmons, 228 N.C. App. at 429, 746 S.E.2d at 315 (noting that the Reid court "held that a plaintiff's claim for relief under the NCDCA will not survive absent proof of actual injury"). Hester admits that Dish Network never

16

obtained $175.15 from her account, stating that "[Dish Network] could not get it, and I wish I had the bill because it states that they couldn't get it from my account." Hester Dep. 63; see Compl. ¶ 56 (alleging that Dish Network "attempted to draft $175.15 from [Hester's] BB&T account in late August or early September 2014, which was unsuccessful . . . .") (emphasis added).

Nowhere does Hester allege actual injury from this attempted collection, much less provide evidence of it. In fact, uncontroverted evidence demonstrates that no attempted collection took place. See Picchione Aff. ¶ 13 ("D[ish Network] did not charge JoAnn Hester's credit card or debit card on file for the outstanding balance of $175.15. That amount was waived by D[ish Network] and Ms. Hester's current account balance is $0.00."). Moreover, in her response brief, Hester indicates that the only injury she does allege is the fee her attorney charged to write a cease-communication letter to Convergent in October 2014. See [D.E. 20] 7–8. That alleged injury, however, is wholly unrelated to Dish Network's alleged attempt to collect on Hester's debt in late August or early September 2014. Simply put, Hester has failed to introduce evidence to support a prima facie case under the NCDCA. See, e.g., Simmons, 228 N.C. App at 429, 746 S.E.2d at 315; Reid, 138 N.C. App. at 266, 531 S.E.2d at 234–35. Accordingly, the court grants summary judgment in favor of Dish Network as to this claim.

4.

As for Hester's claims that Dish Network called Hester on September 25, 2014, the parties dispute whether Dish Network placed this call. Compare Compl. ¶ 58, with Picchione Aff. ¶ 14 ("D[ish Network] did not contact JoAnn Hester or leave a message on her home phone number on September 25, 2014. The phone number referenced in Ms. Hester's Complaint, upon information and belief, is associated with Afni, a third-party debt collection agency."). At summary judgment, the court accepts Hester's contention that Dish Network placed the call. Nonetheless, Hester has not

17

introduced any evidence of injury to support her claim. Because Hester has failed to introduce sufficient evidence to support a prima facie case under the NCDCA, the court grants summary judgment in favor of Dish Network as to this claim. See Simmons, 228 N.C. App at 429, 746 S.E.2d at 315; Reid, 138 N.C. App. at 266, 531 S.E.2d at 234–35; see also Anderson, 477 U.S. at 249.

5.

As for Hester's claim that Dish Network mailed the October 9, 2014 account statement to Hester, this claim fails due to Hester's failure to provide the court with any evidence indicating actual injury resulting from this communication. See Simmons, 228 N.C. App at 429, 746 S.E.2d at 315; Reid, 138 N.C. App. at 266, 531 S.E.2d at 234–35. Alternatively, this claim fails because the alleged conduct is not actionable conduct under the NCDCA. The NCDCA designates "communicating with a consumer . . . whenever the debt collector has been notified by the consumer's attorney that he represents said consumer" as an "unconscionable means" of debt collection. N.C. Gen. Stat. § 75-55(3). The statute, however, expressly exempts communications to a represented consumer that are "statement[s] of account used in the normal course of business." Id. The account statement Dish Network sent to Hester on October 9, 2014, amounts to a non-actionable "statement of account used in the normal course of business." See id.; [D.E. 19-13] 7 (account statement of October 9, 2014). Accordingly, the court grants summary judgment in favor of Dish Network as to this claim.

6.

Finally, on October 15, 2014, Hester alleges that Convergent, "at D[ish Network]'s direction" mailed her a "dunning letter telling her to pay D[ish Network]." See Compl. ¶ 63. Hester claims that, with regard to the Dish Network, this conduct violated the portion of the NCDCA contained within N.C. Gen. Stat. §§ 75-54(4) through 75-55(3). See id. ¶ 65. Unlike her other NCDCA

18

claims, Hester has sufficiently alleged injury as to this claim. Specifically, she has submitted an affidavit from her attorney, Christopher Livingston, of the fees he charged to draft a cease-communication letter to Convergent in response to Convergent's letter to Hester. See Livingston Aff. [D.E. 20-1]; see also [D.E. 21-1] ("Cease-Communication and Attorney Representation Letter" dated October 29, 2014).

Of the various NCDCA provisions Hester cites in support of her claim, only section 75-55(3) remotely relates to this case. As discussed, section 75-55(3) of the NCDCA prevents debt collectors from "[c]ommunicating with a consumer (other than a statement of account used in the normal course of business) whenever the debt collector has been notified by the consumer's attorney that he represents said consumer." N.C. Gen. Stat. § 75-55(3). Moreover, viewing the record in the light most favorable to Hester, Dish Network knew on or about June 9, 2014, that Hester had hired counsel. See [D.E. 19-15] 21 ("Customer states that she will get her lawyer involved, Chris Livingston."). Furthermore, the record reflects that Convergent created its account concerning Hester on October 14, 2014. See Hunter Aff. ¶ 3.

Even if Dish Network knew on or about June 9, 2014, that counsel represented Hester, Hester's claim still fails because the record does not support the logical leap she asks this court to make. To be sure, the record supports the logical inference that Dish Network informed Convergent of Hester's debt before October 14, 2014, an action that the NCDCA allows Dish Network to take. See N.C. Gen. Stat. § 75-53(1)(b) (permitting a debt collector to communicate information regarding a consumer's debt "to a person or business employed to collect the debt on behalf of the creditor"). Hester, however, asks this court to read the record to support her suggestion that Dish Network relayed information regarding Hester's debt to Convergent so that Convergent would contact Hester in violation of the NCDCA despite Dish Network's knowledge that Hester had hired counsel. The

19

record simply does not permit that inference about Dish Network's intent in contacting Convergent. Allowing Hester's claim to survive summary judgment on this record impermissibly would create a "genuine issue of material fact through mere speculation or the building of one inference upon another." Beale, 769 F.2d at 214; Othentec Ltd. v. Phelan, 526 F.3d 135, 140–41 (4th Cir. 2008). Accordingly, the court grants summary judgment in favor of Dish Network as to this claim.

E.

Finally, Hester brings one claim against Convergent under the North Carolina Collection Agency Act ("NCCAA"), N.C. Gen. Stat. §§ 58-70-1 et seq. Compl. ¶ 72. On October 15, 2014, Convergent mailed Hester a letter indicating that she owed Dish Network $175.15. Id. ¶ 63; Ans. ¶ 63; Hunter Aff. ¶ 4. After receiving this letter, Hester's counsel mailed Convergent a cease-communication notice, for which he billed Hester $100. See Compl. ¶ 66; Livingston Aff; [D.E. 21-1] ("Cease-Communication and Attorney Representation Letter" dated October 29, 2014); see also Hunter Aff. ¶ 5 (claiming that Convergent received a phone call from Hester's counsel on October 23, 2014). Hester argues that this communication violated the NCCAA, because "Plaintiff was represented by counsel" when Convergent contacted her. Compl. ¶ 64.

Hester's claim against Convergent fails. The NCCAA creates a civil cause of action against collection agencies if an agency "[c]ommunicat[es] with a consumer when[] the collection agency has been notified by the consumer's attorney that he represents said consumer." N.C. Gen. Stat. § 58-70-115(3); see id. § 58-70-130 (creating civil liability for violations of the NCCAA). Here, Hester's complaint states that her attorney communicated to Convergent that he represented Hester after Hester received Convergent's letter. See Compl. ¶ 66. Moreover, other evidence in the record confirms that Convergent only learned that Hester had hired counsel after Convergent mailed the October 15, 2014 letter. See Hunter Aff. ¶¶ 5–6 (noting that Convergent received its first

20

communication regarding Hester's represented status on October 23, 2014, five days after mailing correspondence to her); Livingston Aff.; [D.E. 21-1] ("Cease-Communication and Attorney Representation Letter" dated October 29, 2014). Because Convergent had not "been notified by the consumer's attorney" until after Convergent mailed the letter on October 15, 2014, Hester cannot prevail on this claim against Convergent under the NCCAA. See N.C. Gen. Stat. § 58-70-115(3). Accordingly, the court grants summary judgment in favor of Convergent as to this claim.

III.

In sum, the court GRANTS defendants' motion for summary judgment [D.E. 16] and DENIES plaintiff's motion for settlement conference [D.E. 22]. Defendants may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This _1_ day of September 2016.

JAMES C. DEVER III
Chief United States District Judge

21